## Case No. 6,927.

### HURST v. DURNELL.

[1 Wash. C. C. 262.] [1]

Circuit Court, D. Pennsylvania.   April Term, 1805.

EJECTMENT IN PENNSYLVANIA — RIGHT OF ENTRY —WARRANT WITHOUT SURVEY—"LIBERTY LANDS"—FIRST PROPRIETOR.

1. The proprietary of Pennsylvania, by his promise to first purchasers, did not deprive himself of the right to lay off the manor of Springettsbury, north of the city of Philadelphia.

2. A warrant without a survey, made under a legally authorized surveyor, does not, by the practice of Pennsylvania, give a right of entry to support an ejectment.

3. The contract for liberty land, between the proprietary and those who entitled themselves to it, by taking up lands in the country, operated severally with each purchaser, and not with the whole, so as to constitute them tenants in common.

4. Those who were entitled to liberty lands, were bound to have them laid off, by surveyors regularly appointed, as in other parts of the then province; the law being the same, as to those lands, as to other lands in Pennsylvania.

5. The proprietary was neither an agent, nor a trustee, for the first purchasers.

The title of [Timothy Hurst], the lessor of the plaintiff, was as follows:—

4th March, 1681. The grant of the govern-

---

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission.]

[2] In Tennessee this is the state prison.

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

ment and soil of Pennsylvania, was made by Charles II. to William Penn, the first.

William Penn, married his first wife in 1672, and had three children, Springett, William; and Laetitia, who married Aubrey. His first wife died in 1696, and afterwards he married again, and had John, Thomas, Richard, Dennis; and Hannah who married Mr. Frame.

Springett and Dennis died in his life time. William Penn died in the year 1718, on the 30th of July.

William, the second, died intestate, in the year 1720, leaving children; Springett, his eldest son, William, and Gulielma, a daughter, who married Charles Fell.

Gulielma died, leaving issue Robert E. Fell, Gulielma Maria Fell, who married Mr. Newcomb; and Mary Margaretta, who married John Baron.

Previous to the first William Penn's coming to America, viz. on the 24th of October 1681; with a view to induce persons to come over and settle upon his lands in Pennsylvania; he agreed with them to lay out a large town in some eligible place, and to give to each person who would take up five hundred acres of land in the country, ten acres in the town. The list, containing the names of the persons with whom this agreement was made, is called, by way of distinction, the list of first purchasers. William Penn came over in 1682; when, it is admitted, that some alteration took place in this first agreement, but the precise terms of it are unknown. The original plan of a city, to contain ten thousand acres, was abandoned; and it was confined to about 1250 acres; and about 16000 acres, adjoining the city, were laid off for the benefit of the first purchasers, in compliance with the first agreement, and was called liberty land.

The name of William, the second, was put down on the list of first purchasers, for 5000 acres; for which a warrant was issued on the 13th September, 1683; and also, one for 200 acres, his proportion of land within the liberties of the city. The former was duly surveyed; the latter was never surveyed, but in the manner hereafter mentioned.

By the will of William, the first, he left certain parts of his private estate, to the children of his first wife; and the government and soil of Pennsylvania, to the children of his second wife.

The two branches differing about the will, an accommodation finally took place, the 23d of September 1731, between the children of William Penn, the second, and his sister Laetitia, the children by the first ventre, and those by the last wife; by which the former surrendered their claim to the government and soil of Pennsylvania; reserving their right to all their private lands, whether derived under specific bequests, in the will of William, the first, or otherwise acquired by them.

By the intestate law of Pennsylvania, at

the time of the death of William, the second, his eldest son, Springett, became entitled to one-half of his real estate; William, the third, to one-fourth; and Gulielma to one-fourth. Upon the death of Mrs. Fell, her eldest son, Robert E. Fell, became entitled to one-half of her one-fourth of the estate of William, the second; and his two sisters, to one-fourth each, of that one-fourth. Being thus entitled, Robert E. Fell, in his own right, and as attorney for his sister Gulielma; conveyed to Timothy Hurst, in fee, by deed dated 10th May 1770, all the lands to which he or his sister were entitled, in Pennsylvania, or elsewhere in America. On the 13th of June 1770, the surveyor general and secretary of the land office, having refused to issue a warrant to Timothy Hurst, for surveying the proportion of liberty land, to which he was entitled, in right of Robert E. Fell and his sister, under the warrant for 200 acres, issued to William Penn, the second; the original warrant was put into the hands of Joseph Hall, a surveyor, but not an authorized one; who laid it upon 31 acres on the Delaware, adjoining Vine street and Pegg's run, and at that time built upon, as was proved by a witness in the cause.

Wallace, Lewis & Levy, for plaintiff, contended: 1st, upon the evidence, that the land in question was part of the liberty lands, which William Penn, the first, had agreed to appropriate to the use of the first purchasers; and that he had no right to appropriate any part of it to his private use, as would be relied upon in support of the defendant's title. 2d. That William Penn was a trustee for the first purchasers; and therefore, that the act of limitation did not run. They cited 2 Wils. 144.

The ground taken by Ingersoll and Rawle, for defendant, was; 1st, that the land in question, was laid off by the proprietary, for a manor, which he called "his manor of Springettsbury," in the year 1681; and though no warrant or survey appears, yet the boundaries of it are sufficiently proved by the testimony. 2d. That plaintiff has no title, having only a warrant, without a legal survey. 3d. That the plaintiff is barred by the act of limitation. 4th. Length of time creates a presumption against the title.

The arguments of counsel, and the evidence, are pretty generally noticed in the charge.

WASHINGTON, Circuit Justice. On the 23d of September, 1731, an agreement was made between the younger and elder branches of the Penn family; by which the right of government, and soil of the province of Pennsylvania, was confirmed to the younger branch, and the private rights of the elder branch were confirmed to them. The plaintiff claims under the elder branch, and he founds his title on the warrant to William Penn, the second, for 200 acres of liberty

land; to which he was entitled in virtue of his character as first purchaser. The defendant claims under the younger branch of the family, who became, by the will of the first William Penn, and the subsequent family compact, entitled to all the proprietary rights in this province. The title of the defendant is founded upon the right of the first William Penn, to a certain district of country lying between Vine street, Pegg's run, the Delaware, and so north and west to the Schuylkill; which it is said was appropriated by the proprietary to his own use, as a manor; and consequently that the first purchasers had no right, to lay their warrants upon lands, thus appropriated to the use of the proprietary.

The first great inquiry is, was the land in question laid off by the first proprietary for a manor; or was it laid off and appropriated as liberty land, for the use of the first purchasers? This is a question of fact for the consideration of the jury.

Second. If it was laid off for a manor, had the proprietary a right to appropriate it to his private use? This is a question of law for the court.

1st. To prove that the tract, containing 1840 acres, of which the land in question is a part, was laid off for a manor, the defendant relies upon the following evidence: (1) An account of Mr. Fairman, formerly a surveyor of the proprietaries, dated in 1682; in which he charges the proprietaries "for taking an estimate of a vacancy on both sides of the town, divided from the liberty land; which the proprietary accepted, and afterwards called it the manor of Springettsbury. (2) An old map, supposed to have been made, and by comparison of hands, believed to have been in the handwriting, of Edward Pennington, surveyor general, about the year 1701; in which the manor is laid off, in the manner contended for by the defendant. The boundaries of this manor have lately been laid off, according to adjoining surveys, calling for the manor; and found to correspond with this ancient map. The admission of this map was objected to, but admitted by the court as an old paper which supports, and has gone along with the possession; and though not signed by Edward Pennington, yet from the similarity of the handwriting, with that found in the office of the same person, whilst he was surveyor general, it was supposed by the court to be proper to leave it to the jury, to give to it such weight as the support it may receive from other parts of the evidence, might, in their opinion, entitle it to. (3) As a further corroboration of the manor having been once surveyed, as distinct from the liberties; we find, in the year 1703, a warrant for re-surveying it, as also the liberties. (4) Then follow the lines of all the adjoining surveys, calling for and fixing the boundaries of this manor. Ancient boundaries are frequently established, by the reputation and understanding of the neighbourhood. When no better evidence can be obtained, even the

hearsay of old persons, now dead, as to the reputed bounds, is often, and properly, resorted to. The lines of junior patents, calling for those of elder patents, contribute to establish the latter. But upon a question which not only involves the boundaries of this manor, but the right of the proprietary to lay it off; surveys, and grants binding upon the manor, and calling it the property of the proprietary, and this within a few years after it was laid off, are the strongest kind of evidence. It is the testimony of men, who must have been well acquainted with the fact; attesting the truth of it, by acts which leave no room for doubt. We find more than twenty surveys, fixing the lines of the manor, as laid down in the map, said to be Pennington's; and all of them calling it, the manor of Springettsbury—proprietary's, or governor's land. These surveys, grants, and warrants, were made from the year 1684 to 1691. Then come the proceedings of the commissioners of property, in 1691, which fix the boundaries of the manor at the north end of the city, bounding on the Delaware and Pegg's creek. In the sales of Hartzfelter's tract, made by Pegg to Fitzwater, in 1720; from Fitzwater to Stenner, in 1737; from Stenner to Wishart, in 1759; they all call this "Governor's Land in the Northern Liberties." In 1696, upon a division amongst the Swanson family, they attest the same fact. And, in 1736, we find by a petition, called the "Stone Quarry Petition," signed by a great number of persons, amongst whom are some of the first purchasers, the same admission is made. This is the evidence, and proves the existence of the manor, and of its bounds. The proofs are progressive, and are afforded in different ways, from the year 1684 to 1759. On the other side, the plaintiff has produced a great number of surveys, warrants, and grants, extending from the south-west side of the Schuylkill, and surrounding the manor as far north and east as Cohocksink creek; in which the lands they cover are called "liberty lands." Now this evidence does not, in any respect, conflict with, or disprove the fact asserted by the defendant; because the establishment of liberty lands does not disprove the existence of a manor, unless those surveys of liberty lands had been located within the bounds of the manor; which is by no means the case. The defendants prove the existence of a manor, and admit there were liberty lands adjoining Philadelphia, and adjoining also the manor. The jury will therefore say, upon this point, whether, at the distance of one hundred and twenty years, the proofs of the defendant are satisfactory, to establish the lines of this ancient manor.

2d. The next question is, had the proprietary a right to establish this manor? He certainly possessed the right, unless he precluded himself, by the concessions made to the first purchasers. But this was by no means the case. He stipulated to lay off so much land, for the benefit of the first pur-

chasers, adjoining the city; and the warrant to Noble, in 1682, directing him to survey and surround a certain quantity of land adjoining the city of Philadelphia, for the benefit of first purchasers; may well be considered as evidence of this fact. Now the liberty lands do adjoin the city on the west; and as this warrant does not say that it is to adjoin it also on the north, the promise of the proprietary is complied with; although he appropriated to his own use the land at the north end of the city. But whatever was the nature of the last agreement, made with the first purchasers; it was in the power of all the parties concerned, to alter it; and the entire acquiescence of the first purchasers, to the establishment of this manor, ought at this day to be considered as evidence of an agreement, by which the proprietary was permitted to make such an appropriation. Even William Penn, the second, by having never surveyed his warrant for 200 acres, though he was careful enough to survey his warrant for country lands; affords evidence that he had no right to locate it within the manor.

3d. The next question, also a question of law, is, can the plaintiff recover on his warrant and survey? It is agreed by the counsel on both sides, that a warrant, without a survey, does not in this state give a legal right of entry; and it is also agreed as a general rule, that the survey, to be valid, must be made by an authorized surveyor, which has not been done in this case. But it is contended by the plaintiff's counsel, that as soon as the liberty lands were laid off, the legal estate thereto became vested in the first purchasers, as tenants in common; and that either tenant in common, might lay off his part, in severalty, without the aid of an authorized surveyor. If the first part of the position were established, I do not know that the consequence would follow. I should doubt the power of one tenant in common, to carve for himself, and say; that by virtue of such an act, he had appropriated this or that particular spot to his own use, in severalty. But the truth is, that the contract was made, not jointly, but severally, with each first purchaser; and the laying off the liberty lands, was only saying, that within those bounds, each first purchaser might locate his liberty land. But the same political reasons, which required an authorized survey to locate warrants in other parts of the province, applied with equal force to this particular territory. The warrants, with respect to these lands, were severally issued, and were directed to the surveyor general. He, then, or his deputies, could alone execute them.

4th. The next question is, is the plaintiff barred by the statute of limitations? The warrant issued in 1682—it is argued that it was never executed till 1770, and that the plaintiffs never were in possession. It is said that there was a trust in this case, and William Penn, the first, was called the trustee. Under the 3d point, it was said, the legal estate passed to the first purchasers. The counsel perceiving the dilemma to which he was exposing himself, endeavoured very dexterously to avoid it, by calling William Penn, an agent for the first purchasers: but I do not see any ground for this. He issued warrants to each, authorizing them to survey liberty lands. This they might do or not, as they pleased, and he had no control over them, nor had he any agency in the business. But it is said, that when the proprietary took up this manor, he must have intended to include the rights of his two children, William, the second, and his sister. There is no kind of proof of this. But suppose it were the case, then it would follow, that William, the son, had only an equitable claim to lay his warrant somewhere within the manor; which would be a complete objection to his recovery at law.

Jury found a verdict for the defendant.

[A motion for attorney's fees was passed upon in Case No. 6,928. A similar ejectment suit was tried in Case No. 6,936. In Case No. 6,940, a motion for a continuance on the ground of an improper newspaper publication was denied.]